UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

DENNIS WHITSETT,

                    Petitioner,                    Case No. 1:09-cv-358

v.                                               Honorable Robert Holmes Bell

CINDI CURTIN,

                    Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was charged in eight different cases in Wayne County stemming from allegations of criminal sexual conduct involving eight different complainants. These prosecutions resulted in twenty-five separate convictions. Three of those cases, the ones at issue here, were consolidated for trial. In the first case involving Antoinette Perry (No. 06-009944-01), Petitioner was convicted of attempted kidnapping, MICH. COMP. LAWS § 750.349, for which he was sentenced as a second habitual offender to imprisonment of three to five years. In the second case involving Crystal Davis (No. 06-009943-01), Petitioner was convicted of two counts of first-degree criminal sexual conduct (CSC), MICH. COMP. LAWS § 750.520b(1)(c) and (f); kidnapping, MICH. COMP. LAWS § 750.349; and second-degree CSC, MICH. COMP. LAWS § 750.520c(1)(c). For those offenses, the trial court sentenced Petitioner as a second habitual offender to 29 to 50 years' imprisonment for each first-degree CSC conviction, 29 to 50 years' imprisonment for the kidnapping conviction and 10 to 15 years' imprisonment for the second-degree CSC conviction. In the third case involving Tanitha

Gayles (No. 06-009942-01), Petitioner was convicted of three counts of first-degree CSC, MICH. COMP. LAWS § 750.520b(1)(c) and (e); and kidnapping, MICH. COMP. LAWS § 750.349. He was sentenced as a second offense habitual offender to 29 to 50 years' imprisonment for each first-degree CSC conviction and 29 to 50 years' imprisonment for the kidnapping conviction.[1]

In his *pro se* petition, Petitioner raises five grounds for relief, as follows:

I. WAS IT ERROR FOR THE TRIAL COURT TO GRANT THE PROSECUTION'S PRETRIAL MOTION TO CONSOLIDATE THREE CASES AGAINST [PETITIONER], WHICH CONSISTED OF A COMBINED TOTAL OF TEN CRIMINAL CHARGES, INTO ONE TRIAL?

II. WAS IT ERROR FOR THE TRIAL COURT TO GRANT THE PROSECUTION'S PRETRIAL MOTION TO ADMIT EVIDENCE OF OTHER CRIMES, WRONGS OR ACTS PURSUANT TO MRE 404(b) WHERE THE PROFERRED EVIDENCE WAS FACTUALLY DISTINCT FROM THE FACTS OF THE THREE CASES FOR WHICH [PETITIONER] WAS TO BE TRIED IN ONE CONSOLIDATED TRIAL AND MUCH MORE UNFAIRLY PREJUDICIAL THAN PROBATIVE?

III. WAS IT ERROR FOR THE TRIAL COURT TO DENY THE [PETITIONER'S] MOTION FOR A MISTRIAL WHERE A PROSECUTION WITNESS WAS ALLOWED TO TESTIFY PURSUANT TO MRE 404(b) WHOSE TESTIMONY DID NOT SUPPORT THE PROSECUTION'S CLAIM OF A SIMILAR DESIGN, PLAN OR SCHEME BUT WAS INSTEAD PROPENSITY EVIDENCE AND WHERE THE PROSECUTION HAD IDENTIFIED TWO OTHER SUCH WITNESSES IN ITS OPENING STATEMENT WHO SUBSEQUENTLY WERE NOT ALLOWED TO TESTIFY?

IV. DID THE INSUFFICIENT EVIDENCE PRESENTED DURING THE [PETITIONER'S] TRIAL ON THE ELEMENTS OF NO CONSENT, TO SUPPORT THE JURY'S VERDICTS OF GUILTY OF MULTIPLE COUNTS OF CRIMINAL SEXUAL CONDUCT AND KIDNAPPING, CONSTITUTE THE DENIAL OF DUE PROCESS OF LAW

---

[1] As a result of a trial the following year, petitioner is serving seven life sentences for multiple convictions for first-degree criminal sexual conduct.

GUARANTEED BY THE FIFTH AMENDMENT OF THE CONSTITUTION.

V.    DO THE SEVEN CONCURRENT TWENTY[-]NINE YEAR TO FIFTY YEAR SENTENCES, IMPOSED PURSUANT TO THE [PETITIONER'S] MULTIPLE CONVICTIONS FOR FIRST-DEGREE CRIMINAL SEXUAL CONDUCT AND KIDNAPPING AS A SECOND HABITUAL FELONY OFFENDER, CONSTITUTE A VIOLATION OF THE GUARANTEE AGAINST CRUEL AND UNUSUAL PUNISHMENT PROVIDED BY THE UNITED STATES CONSTITUTION AND THE GUARANTEE AGAINST CRUEL AND UNUSUAL PUNISHMENT PROVIDED BY THE MICHIGAN CONSTITUTION.

Respondent has filed an answer to the petition (docket #9). Upon review and applying the AEDPA standards, I find that Petitioner's claims are without merit. Accordingly, I recommend that the petition be denied.

## Procedural History

### A.    Trial Court Proceedings

The prosecutor filed a pre-trial motion to consolidate three of the cases against Petitioner for trial, arguing that it was in the best interest of justice, judicial economy and the witnesses. (12/1/06 Final Conference, 4, docket #17.) All three of the cases involved the forcible abduction of young women from the streets of the City of Detroit, allegedly by Petitioner while he was driving a black Lexus. One of the victims was able to escape, but in the other two cases, the assailant used a weapon to force the victims into the car, drove them to locations in the City of Detroit and forcibly raped them in the car. (*Id.*) Defense counsel countered that the cases were not sufficiently similar to support the motion and that presenting all three cases to the same jury was unduly prejudicial. (*Id.* at 5.) The trial court granted the motion to consolidate. (*Id.* at 9-12.) In granting the motion, the trial court noted that even if the cases were not consolidated, the court

would "undoubtedly allow the evidence in under 404(b)" to show a common plan or scheme  (*Id*. at 9.)

The prosecutor also moved to allow the testimony of three other victims under Mich. R .Evid. 404(b).  Defense counsel continued to argue that testimony from three additional witnesses, whose cases were less factually similar than the three cases being tried, would be unfairly prejudicial to Petitioner.  (*Id*. at 13-14.)  The trial court ruled that the testimony was relevant to criminal intent, which Petitioner intended to deny by claiming that the victims consented to have sex with him.  (*Id*. at 14-15.)

Petitioner was tried before a jury beginning March 12, 2007, and concluding on March 16, 2007.[2]  During his opening statement, the assistant prosecutor told the jury that Petitioner had assaulted six young women in the City of Detroit between December 2005 and his arrest in July of 2006.  (Tr. II, 9.)  In addition to the three cases before them, the assistant prosecutor told the jury about three other witnesses who would testify about criminal conduct for which Petitioner was not being tried as evidence that Petitioner had a common plan or scheme to sexually assault young, African-American women in the City of Detroit.  (Tr. II, 14, 17-18.)  The prosecutor briefly described each of the cases.  First, he told the jury about Crystal Young, who first encountered Petitioner a couple of days before the assault while she was walking on the east side of Detroit.  (Tr. II, 14.)  After a couple of phone conversations with Petitioner, she agreed to go to breakfast with him on the morning of December 6, 2005.  (Tr. II, 13-14.)  Petitioner picked up Young and drove to a

---

[2]The trial transcripts will be referred to as follows:
"Tr. I"   Trial Volume I, March 12 2007 (docket #20)
"Tr. II"  Trial Volume II, March 13, 2007 (docket #21)
"Tr. III" Trial Volume III, March 14, 2007 (docket #22)
"Tr. IV" Trial Volume IV, March 15, 2007 (docket #23)

Lowe's parking lot, where he allowed her to drive the car. (Tr. II, 15.) Petitioner made up an excuse to drive to his home and then forced Young inside the house when she refused to enter. (*Id.*) Petitioner allowed her to leave after an hour, but then followed her in his car and demanded that she come with him. When she refused, he forced her into the car and took her back to his house where he attempted to sexually assault her. (*Id.*) Petitioner eventually stopped when Young resisted and she left his house for the second time. Petitioner came after her again, but Young was rescued by a good Samaritan. (*Id.*)

The second witness discussed by the prosecutor was Latina Anderson. On the afternoon of February 2, 2006, Anderson was walking with a male friend to Danby High School when Petitioner approached and asked her out. (Tr. II, 16.) Anderson told Petitioner that she had to go to school, so he offered them a ride. (*Id.*) The school was closed, and Petitioner then offered to drive them home. He drove Anderson's friend home first and then let Anderson drive his Lexus. (*Id.*) Petitioner made up an excuse to go to his home and invited Anderson inside. She entered the house voluntarily, but refused when Petitioner asked her to have sex. Petitioner struck Anderson in the face and forced her to perform sexual intercourse in a variety of positions. (*Id.*)

Finally, the prosecutor told the jury about Ebony Smith's case. Smith's case was unique from the others because she was acquainted with Petitioner before the sexual assault. (Tr. II, 16.) On July 27, 2006, while Ebony was walking down Gratiot, Petitioner stopped and offered her a ride. (*Id.*) She accepted the ride and smoked marijuana with him in the car. (Tr. II, 17.) Petitioner then made up an excuse to go to his house and asked her in. (*Id.*) Smith entered the house voluntarily, but when she refused his sexual advances, he struck her in the face and forced her to

perform sex in a variety of positions. (*Id.*) After the sexual assault, he threatened her and her family, and then asked if she wanted to drive his car. (*Id.*)

Eighteen-year-old Antoinette Perry was the first complainant to testify at trial. Perry testified that as she was walking from her grandmother's house to her cousin's house on the morning of June 12, 2006, a man driving a black Lexus drove up beside her and asked if she would like to go out to eat with him. (Tr. II, 33-36, 50.) Perry identified Petitioner as the man driving the Lexus. (Tr. II, 35.) Perry declined the invitation and Petitioner began following her at a distance. (Tr. II, 36-37.) Perry was worried about being followed and turned back toward her grandmother's house. (Tr. II, 37.) Petitioner drove past her again and she heard the car door open. (Tr. II, 38.) Perry began to run, but Petitioner grabbed her by the hood and she fell back on the ground. (Tr. II, 39-40.) He hit her in the face about six times and called her "bitches." (*Id.*) Perry kicked and screamed as Petitioner grabbed her by the legs and pulled her toward his car. (Tr. II, 40-41.) Perry managed to get up. Petitioner grabbed her purse. Perry let go of her purse and ran to a nearby house for help. (Tr. II, 41.) The homeowner let her in, and Perry called her aunt, Fatima Lawson, from the house. (Tr. II, 42-43.) Thereafter, they notified her parents and went to the police station to report the incident. (Tr. II, 44.) Perry also went to the hospital because her left eye was swollen closed. (Tr. II, 45.)

Perry testified that on the day of the attack, her mother drove her to the house where Perry had gone when she fled from Petitioner to thank the owner for helping her. (Tr. II, 47.) As they were leaving the house, Perry saw Petitioner drive by in his car. Perry recognized Petitioner and knew it was the same car because the right rearview mirror was broken off. (*Id.*) Perry's mother

took down the license plate number and flagged down a police car to report the information. (Tr. II, 48.)

Fatima Lawson testified that she lived in Detroit with her mother, brother and her three children. (Tr. II, 69.) Perry spent the night at their house and left sometime in the morning to go to a friend's house. About twenty minutes later, Perry called Lawson's cell phone. (Tr. II, 70, 75.) Perry was crying and told her that a guy had attacked her. (Tr. II, 71.) Lawson immediately went to pick up Perry at a house on Hazelridge. (Tr. II, 71-72.) When Lawson arrived, she observed that Perry's eye was black and closed, and her clothes were ripped. (Tr. II, 73.) Lawson called Perry's parents, and they took her to the police station. (Tr. II, 74.)

Marie Perry, Antoinette Perry's mother, testified that the victim was crying and very upset following the attack. (Tr. II, 81.) Mrs. Perry observed that Antoinette had bruises on her face and scratches on her hand. (Tr. II, 80.) After they left the police station, Mrs. Perry wanted to go thank the man who had helped Antoinette after she was attacked. (Tr. II, 82.) As they were leaving the man's house on Hazelridge and McCrary, they saw a black Lexus. (Tr. II, 83.) Antoinette starting crying and ducked down in her seat, because the man in the Lexus was the person who had attacked her. (Tr. II, 83, 89) After the Lexus went by, Mrs. Perry took down the license plate number. Mrs. Perry observed that the man driving the car was bald. (Tr. II, 84.) Mrs. Perry flagged down a Detroit police officer at Whittier and Hayes and gave him the information about the car. (*Id.*) She also told the officer that the make of the car was Lexus, because her daughter had told the police that it was a Neon. (Tr. II, 86, 90-92.)

Doctor Jacklyn McParlane testified that she treated Antoinette Perry at the Botsford Hospital Emergency Department on June 12, 2006. (Tr. II, 23.) Perry reported that she had been

assaulted and had swelling and bruising around her eye with some bleeding in the eye called a subconjunctivitis hemorrhage. (Tr. II, 24.) The injury was consistent with someone punching her in the eye. (Tr. II, 25.)

Crystal Davis, the second complainant to testify, also was eighteen-years-old at the time of trial. (Tr. II, 96.) Davis testified that she was raped on May 31, 2006, and identified Petitioner as the man who raped her. (Tr. II, 96, 126-27.) As Davis was walking to Caesar Chavez High School, she passed by Petitioner, who was standing at a corner. (*Id.*) Shortly thereafter, Petitioner ran up behind her and pushed her down. (Tr. II, 97-98.) As Davis lay on her back, Petitioner stood over her and put a screw driver toward her forehead. Davis tried to scream, but he threatened to kill her if she screamed again. (Tr. II, 99-100.) Petitioner instructed her to follow him to his car, which was around the corner. (Tr. II, 101, 134.) Davis walked to the car and got in the passenger seat, because she did not want him to kill her. (Tr. II, 100-101.) After Petitioner started driving, Davis tried to jump out of the car, but he put the screw driver to her thigh and asked her if she felt how sharp it was. (Tr. II, 103.) Petitioner asked Davis if she wanted something to eat. (Tr. II, 104, 136.) She said "yes" because she wanted to go to McDonald's and get away from him. (Tr. II, 104.) Petitioner parked the car in the area of Elsmere and Woodmere and told Davis to pull her pants down. (Tr. II, 104-105.) She complied because she did not want Petitioner to kill her. (Tr. II, 107.) Petitioner got out of the car and went to the trunk. He came back with oil on his hands and rubbed the oil on Davis' vagina. (*Id.*) At that point, Petitioner moved the car down the street because there was a man mowing his lawn. (Tr. II, 109.) Petitioner told her "to get it hard," which she took to mean that he wanted her to perform oral sex on him. (Tr. II, 110.) Davis complied for fear that Petitioner would kill her. He then told her to get on top of him while he was sitting in the

driver's seat. (Tr. II, 111.) Davis complied and got on top of him facing away from him. (Tr. II, 112.) Petitioner penetrated her vagina with his penis and moved her hips up and down with his hands. (Tr. II, 112-14.) Petitioner pulled his penis out and ejaculated. (Tr. II, 115.) He told her to pass him a shirt from the back seat, and he used it to wipe himself off. (*Id.*) Petitioner then asked Davis her name and where she lived. Davis remained fearful and answered him. (Tr. II, 116.) Petitioner asked her again if she was hungry, and she said "no." (Tr. II, 117.) He dropped her off at her school and told her that he would come back to pick her up at 1:00 p.m. (*Id.*) Petitioner threatened that he would "throw a cocktail through [her] house" if she told anyone about what had happened. (Tr. II, 118.)

Davis testified that when she got back to school, she called her friend, Ebony, who also was at school. (Tr. II, 120.) Davis told Ebony that she had been raped. (Tr. II, 121.) Davis then went with Ebony to the office of the school security officer, Mr. Martinez, and reported the rape to him and Miss Rodriguez. (Tr. II, 121-23.) Davis was still upset and crying when she told them what had happened. (Tr. II, 123.) Mr. Martinez called the police and ambulance. Davis was taken to D.M.C. Receiving Hospital, where she received a rape exam. (Tr. II, 124.) On cross-examination, Davis denied meeting Petitioner at Coney Island or asking him to meet her near the school on the morning of May 31. (Tr. II, 129.) She further denied that she asked Petitioner for money or that he offered her money for sex. (Tr. II, 136.) Davis did not give Petitioner her phone number. (Tr. II, 143.)

Jeffrey Denys testified that he was an E.M.S. technician for the Detroit Fire Department. (Tr. II, 152.) He responded to the call on May 31, 2006, from Caesar Chavez High

School. Crystal Davis told him that she had been knocked down and raped. She had an abrasion on her right elbow. (Tr. II, 153.)

Sylvia Hill testified that she drove her daughter to Caesar Chavez High School on the morning of May 31, 2006. On the way, she noticed a girl walking toward the school wearing a back pack. (Tr. II, 158.) Hill then observed a man run up behind the girl and knock her to the ground. The girl was yelling when she went down. (Tr. II, 160.) The man was holding the girl's right wrist with one of his hands and his other hand was up close to her face, but Hill could not tell if he was holding anything. (Tr. II, 158-59.) Since it was late in the morning, Hill thought maybe it was a father catching his daughter skipping school. (Tr. II, 160.) The man was bald and was wearing a white t-shirt, denim shorts and white shoes. (*Id.*) Hill saw the man pull the girl up by the wrist. Hill knew Crystal Davis, but did not see her well enough to recognize her that morning. (Tr. II, 161-63.) Hill did not report the incident, but would have reported it if she had known it was Davis. (Tr. II, 165-66.)

Lawrence Sharp, Jr., testified that he lived on Fulton near Elsmere and Fort Street. (Tr. II, 167-68.) When Sharp went out to cut his lawn sometime between 10:00 a.m. and noon on May 31, 2006, he noticed a black car parked down towards the dead end. (Tr. II, 169-70.) He could see a large man sitting in the driver's seat. He also could see someone in the passenger seat. (Tr. II, 169.) Sharp eventually saw the car drive away and turn right on Elsmere. (Tr. II, 171.)

The parties stipulated that Crystal Davis was treated at Detroit Receiving Hospital on May 31, 2006, at 11:30 a.m. (Tr. III, 43.) She had an abrasion on her right elbow. The internal vaginal examination revealed two very small and superficial abrasions in the superior aspect of the labia minora. (*Id.*) The lab test did not demonstrate any seminal fluid. (*Id.*)

- 10 -

The third complainant, Tanitha Gayles, testified that she was raped on March 6, 2006, and identified Petitioner as the man who raped her.  (Tr. II, 173, 197.)  Gayles was walking down Gratiot on the way to the bus stop when Petitioner, who was standing by the cleaners, started trying to talk to her.  (Tr. II, 175.)  He asked if he could take her out to breakfast.  Gayles lied and  told him that she was on her way to her sister's house because she wanted him to leave her alone.  (*Id.*)  Petitioner gave her his phone number and asked for hers.  (Tr. II, 176.)  Gayles kept on walking and the next thing she knew, he had his arm around her and held a knife to her throat.  (*Id.*)  Petitioner told her that he just wanted to take her out for breakfast and told her to follow him.  (Tr. II, 177, 205.)  Gayles saw that he had a car that already was running.  Petitioner opened the passenger door for Gayles and told her to open the driver's door for him.  Gayles complied because she was afraid he would kill her.  (*Id.*)  After they got in the car, Petitioner rolled a joint.  (Tr. II, 177-78.)  Gayles was crying hard and he asked her why she was crying because he had not touched her.  (Tr. II, 178.)  Gayles thought he was going to rob and kill her.  (Tr. II, 179.)  Petitioner began driving and asked her if she wanted to hit the joint.  (Tr. II, 180.)  She said "no" and continued to cry.  (Tr. II, 180-81.)  Petitioner got mad and told her to stop crying.  (*Id.*)  Gayles saw a police car and thought about trying to escape, but Petitioner told her that he would shoot her in the back if she tried to escape.  (Tr. II, 182.)

Gayles testified that Petitioner parked in front of a field.  (Tr. II, 183.)  He put his hands down her pants and rubbed her clitoris.  (Tr. II, 185.)  Gayles initially refused to pull down her pants, but when Petitioner started counting down from ten, she was afraid and complied with his request.  (Tr. II, 186-87.)  Gayles had asked him to stop at a gas station to get a condom so that she would have an opportunity to escape, but he would not stop.  (Tr. II, 187.)  Petitioner pulled his penis

- 11 -

out of his pants and told her to "get it hard." (Tr. II, 188.) Gayles continued to cry and Petitioner pushed her head towards his penis. (*Id*.) After that, he told her to get on top of him. (Tr. II, 189.) Gayles complied and Petitioner put his penis in her vagina. (Tr. II, 190.) He told her to get up and his sperm went into his hand. (Tr. II, 191.) Petitioner asked her if she had something he could wipe himself with, so she gave him a panty liner from her book bag. (*Id*.) He used the liner and threw it on the ground. (Tr. II, 192.) When Petitioner asked what he should do with her, she cried and started ranting about her daughter. (*Id*.) Gayles hoped that he would let her go if she showed him pictures of her daughter. (Tr. II, 193.) Petitioner asked her where she wanted to go and dropped her off at her house. (Tr. II, 194, 212.)

Gayles testified that she initially was not going to call the police because it was her word against his. (Tr. II, 194.) However, after talking to her sister-in-law, Gayles decided to tell the police. (*Id*.) Gayles went to the hospital and underwent a rape exam. (Tr. II, 195-96.) On cross-examination, Gayles testified that she never asked Petitioner for money and he never offered her money for sex. (Tr. II, 207.)

Christine Hotra testified that she was a certified sexual assault nurse examiner. (Tr. II, 214-15.) She examined Gayles on March 8, 2006. (Tr. II, 230.) The victim's account of the sexual assault was consistent with her trial testimony. (Tr. II, 224-25.) Hotra did not find any acute injury to Gayles' body during the exam. (Tr. II, 230-32.)

Detroit Police Officer Oscar Martinez testified that he worked as the security officer at Caesar Chavez Academy. (Tr. III, 14.) On May 31, 2006, Martinez was in his office at Caesar Chavez when he heard a commotion in the hallway. (Tr. III, 14.) He found two girls in the hallway hugging each other, and one of them, Crystal Davis, was crying hysterically. (Tr. III, 15.) Martinez

yelled at her to calm down, but she continued to cry. (Tr. III, 16.) Davis initially told Martinez that she could not tell him what was wrong, but after a few minutes, she told him that she had been raped. (Tr. III, 17.) Davis' account of the kidnapping and sexual assault was consistent with her trial testimony, except that Martinez did not recall Davis saying anything to him about oral sex. (Tr. III, 19-21, 31-32.) However, Martinez stopped questioning Davis and called 911 as soon as she told him that the man put his penis in her vagina. (Tr. III, 34.) He did not ask Davis if she had any other sexual contact with the man, because the sex crimes unit would conduct a full investigation. (Tr. III, 34-35.) Martinez and another officer immediately drove the route described by Davis. (Tr. III, 21-22.) Martinez interviewed a man who was cutting grass on Elsmere who gave a statement corroborating what Davis had told him. (Tr. III, 22.) Martinez reviewed video from the school security cameras and could see Davis coming from the direction of a dark colored car driven by a black male wearing a white t-shirt. (Tr. III, 24-26.) Detective Sergeant Bill Torley from the Michigan State Police downloaded the video as part of the investigation. (Tr. IV, 16-18, 41.) Torley testified that he attempted to enhance the video to read the license plate number on the car, but was unsuccessful. (Tr. IV, 46-49.)

Crystal Young was the first 404(b) witness called by the prosecutor. Young testified that in December of 2005, she had been at her aunt's house in Detroit and was walking down Waltham Street to catch a bus home to Roseville. (Tr. III, 46-48.) Petitioner came around the corner in his car and started talking to her. (Tr. III, 47.) Petitioner asked Young for her phone number and she gave it to him. (Tr. III, 48.) Petitioner called her several times over the next two days and she agreed to have breakfast with him on December 6. (Tr. III, 50, 73.) Petitioner picked her up in his black Lexus. (Tr. III, 50.) As they were driving, Petitioner said that he needed to go home and check

- 13 -

on some packages and asked if she wanted to drive. She said "yes" because she had never driven a Lexus. (Tr. III, 52.) Petitioner gave Young directions and she drove to his house. (Tr. II, 52.) Young declined Petitioner's invitation to go into the house and moved to the passenger seat. (Tr. III, 55-56.) Petitioner came back from the house, opened the passenger door and pulled Young out by the arm. He walked her up to the house and pushed her through the door. (Tr. II, 56.) Young sat down in a chair and Petitioner was talking and asking her if she liked him. (Tr. II, 61.) After about an hour, Petitioner let her leave the house. (Tr. II, 62-63.)

As Young began walking in the direction of her Grandmother's house, she heard Petitioner starting his car. (Tr. III, 64.) Petitioner drove alongside Young and told her that he would drive her home. (Tr. III, 65.) Young refused to get in the car with him. Petitioner parked the car and stood in the sidewalk in front of her. (Tr. III, 66.) Young tried to walk past him, but he grabbed her by the back of her pants pocket and pushed her into the car. Petitioner drove back to his house and told her to go inside. (*Id.*) Young did not want to go back in the house, but she complied. (Tr. III, 67.) Young sat in the same chair and Petitioner tried to put his hands in her pants. She pushed his hands away. Petitioner pulled her out of the chair, took her to a bedroom and pushed her on the bed. Young stood back up, but Petitioner forced her back down on the bed and got on top of her. (*Id.*) Young testified that Petitioner licked her face as he was trying to unfasten her belt and pants. (Tr. III, 68-69.) Young was crying and telling him to stop. (Tr. III, 69.) Petitioner told her to "shut up" or he would punch her. When she continued to cry, he slapped her in the face. (Tr. III, 70.) Petitioner eventually got off of her and she ran out of the house. (*Id.*) Petitioner came after her again in his car, but a neighbor saw what was going on and came to her aid. (Tr. III, 70-72.) The neighbor drove Young to the Harper Woods police station. (Tr. III, 72.)

After Crystal Young's testimony, the trial court revisited the issue of the 404(b) testimony being offered by Crystal Young, Latina Anderson and Ebony Smith. (Tr. III, 86.) The court noted the "glaring dissimilarities" between Young's testimony and the three cases being tried before the court. (*Id.*) The court did not believe that Young's testimony was unduly prejudicial, but questioned whether Anderson and Smith's testimony had sufficient evidentiary value to be admitted at trial. (Tr. III, 96-87.) The prosecutor argued that the three witnesses illustrated how Petitioner became increasingly violent with his victims. The trial court ruled that two witnesses would not be allowed to testify. (Tr. III, 103.) Because the prosecutor already had informed the jury during opening statements that Latina Anderson and Ebony Smith would testify, the court indicated that it would provide a curative instruction. (Tr. III, 103-04.)

Following the court's ruling on the 404(b) evidence, defense counsel moved for a mistrial on the ground that the jury already had heard detailed descriptions of Latina Anderson and Ebony Smith's testimony from the prosecutor during opening statements. (Tr. III, 123.) Defense counsel argued that a curative instruction would not be sufficient to prevent the jury from considering the evidence, which was highly prejudicial. The trial court denied the motion. (Tr. III, 126.)

Maureen Stillwell, the woman who picked up Young and took her to the police station, corroborated Young's story. (Tr. III, 128-36.) Stillwell testified that she lived on Bournemuth in Harper Woods. (Tr. III, 128.) On December 6, 2005, Stillwell saw a girl walking down the street. The girl was crying and Stillwell thought it was strange that the girl was not wearing a coat out in the cold weather. (Tr. III, 129, 131.) Stillwell also saw a black car driving alongside the girl. (Tr. III, 130.) The driver, a black male with a bald head, was talking to the girl,

but she was not responding to him.  (Tr. III, 130-31.)  Stillwell sensed that there was something wrong with the situation and got into her car and drove after the girl.  (Tr. III, 134.)  When Stillwell caught up to the girl, she rolled down the window and asked the girl if something was wrong.  The girl answered "yes," and said that a man tried to rape her.  (Tr. III, 135.)  Stillwell asked if she wanted to go to the police station, and the girl responded in the affirmative.  (Tr. III, 135-36.)

Detroit Police Officer Khary Mason testified that he arrested Petitioner in Harper Woods on July 28, 2006.  (Tr. III, 139-42.)  Petitioner was driving a Lexus at the time of the arrest. The license plate number matched the number that police were looking for in connection with a series of sexual assaults that had occurred in the vicinity.  (Tr. III, 141-42.)  Petitioner's cell phone was placed in evidence.  (Tr. III, 142-43.)

Detroit Police Officer Nicole LaRosa testified that she was the officer in charge of Antoinette Perry's case.  (Tr. III, 160.)  By the time LaRose interviewed Perry, Petitioner already was in custody.  (Tr. III, 163.)  Perry's description of Petitioner and his vehicle, including the license plate number, were consistent.  (Tr. III, 164.)  La Rosa went to the Eastern District property room to search for Petitioner's cell phone, but could not locate it.  (Tr. III, 167.)

Detroit Police Officer Robert Kane testified that he contacted the Harper Woods Police Department for assistance in looking for a black male driving a black Lexus.  (Tr. III, 171-72.) Sergeant Stager from the Harper Woods Police Department provided Kane with the name and location of the suspect, as well as supporting photographs and reports.  (Tr. III, 172-73.)  Kane used the photos to prepare a photographic line-up.  Crystal Davis viewed the line-up and identified Petitioner as the man who raped her.  (Tr. III, 174.)  After the initial identification, Kane went back

to the Sex Crimes Unit to search for any other cases involving a black male in a black Lexus. (Tr. III, 174.)

The parties stipulated that sperm found on vaginal swabs collected from Tanitha Gayles and Crystal Davis matched Petitioner's DNA profile. (Tr. III, 176.)

Detroit Police Officer James Coss testified that he managed the Eastern District Property Office. (Tr. IV, 7.) According to property office records, a cell phone seized from Petitioner was logged into the property room, but Coss was unable to locate it despite extensive searches by him and other officers. (Tr. IV, 10-13.)

At the conclusion of trial, on March 16, 2007, the jury found Petitioner guilty of three counts of first-degree CSC and one count of kidnapping with regard to Tanitha Gayles; two counts of first-degree CSC, one count of second-degree CSC and one count of kidnapping with regard to Crystal Davis; and one count of attempted kidnapping with regard to Antoinette Perry. (Tr. V, 6-7.) Petitioner was sentenced on March 30, 2007. (Sentencing Transcript, (S. Tr.), 17, docket #25.)

## B. Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on September 27, 2007, raised the same five issues as raised in this application for habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, docket #29.) By unpublished opinion issued on June 12, 2008, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (*See* 6/12/08 Mich. Ct. App. Op. (MCOA Op.), docket #29.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same five claims raised before and rejected by the Michigan Court of

Appeals. By order entered December 18, 2008, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Ord., docket #30.)

## <u>Standard of Review</u>

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme

Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410.

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington v. Richter*, 131 S. Ct. 770, 784 (2011); *see also Johnson v. Williams*, ___ S. Ct. ___, 2013 WL 610199, at *6 (Feb. 20, 2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 2013

WL 610199, slip op. at *8. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *Richter*, 131 S. Ct. at 785 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## Discussion

### A.    Consolidation of Cases

In his first ground for habeas corpus relief, Petitioner argues that the trial court erred by granting the prosecutor's motion to consolidate three separate cases against Petitioner for purposes of trial. Petitioner contends that the cases were not sufficiently similar to justify the unfair prejudice that would result from presenting all three cases to the same jury.

The Michigan Court of Appeals considered Petitioner's claim under state law and concluded that the trial court did not abuse its discretion in granting the prosecution's motion. The court explained:

Defendant first argues that the trial court erred in consolidating three cases into one trial. We disagree. We review de novo the question of whether the offenses are related, but a trial court's decision to join related offenses into one proceeding is reviewed for an abuse of discretion. *People v Girard*, 269 Mich App 15, 17; 709 NW2d 229 (2005). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the permissible principled range of outcomes." *People v Babcock*, 469 Mich 247, 274; 666 NW2d 231 (2003).

Under MCR 6.120(B), "the court may join offenses charged in two or more informations or indictments against a single defendant." MCR 6.120(C) provides for severance for separate trials if the offenses "are not related as defined in subrule (B)(1)." Related offenses are those based on: "a) the same conduct or transaction, or b) a series of connected acts, or c) a series of acts constituting parts of a single scheme or plan." MCR 6.120(B)(1). A series of acts constituting parts of a single scheme or plan is established where there is "such a concurrence of common factors that the various acts are naturally to be explained as caused by a general plan." *People v Sabin* (*After Remand*), 463 Mich 43, 63-65; 614 NW2d 888 (2000) (citation and emphasis omitted). The various acts need not be part of a single continuing conception or plot. *Id.*

At the pretrial hearing on the prosecution's motion for joinder, the trial court analyzed the above court rule and correctly concluded that the offenses constituting each case can be viewed as a series of acts constituting parts of a single scheme or plan. In all three cases, defendant approached a young female victim who was walking down the street in Detroit in the morning. In TG's case, defendant asked her out to breakfast, then, after she declined, put a knife to her throat. In CD's case, defendant pushed her to the ground and held a screwdriver to her forehead, then asked her if she wanted to go out to eat. After defendant assaulted TG and CD (separate incidents), he forced them into his car and drove them to a remote location. Defendant then rubbed TG's and CD's vaginas, instructed them to "get it hard," a directive for them to perform oral sex on him, and forced them to have sexual intercourse with him. Thereafter, defendant spoke to them as though their interactions were consensual (telling TG that he did not do anything to her and telling CD that he would pick her up from school), and dropped them off at a location of their choice. With respect to AP, defendant pulled up alongside her and asked her out to breakfast. When AP declined, defendant got out of his car and attacked her, punching her in the face several times. He then attempted to drag her into his car, but

- 21 -

AP was able to get up and run away. A rather reasonable inference could be made that defendant intended to do to AP what he had done to his earlier victims. The similarities in all three cases are not only numerous, they are also meaningful in that they evidence defendant's plan, scheme or system for perpetrating sexual assaults. *Sabin, supra* at 63-64.

(MCOA Op. 1-2.)

To the extent Petitioner claims that the state courts erred in applying the Michigan court rules, his claim is not cognizable for purposes of habeas corpus review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). "Improper joinder does not, by itself, violate the constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his . . . right to a fair trial." *United States v. Lane*, 474 U.S. 438, 446, n.8 (1986). The issue "is not whether the failure to sever counts for separate trials was a violation of a state rule of procedure, but whether the failure to sever denied the petitioner due process of law under the Fourteenth Amendment." *Davis v. Coyle*, 475 F.3d 761, 777 (6th Cir. 2007). To establish prejudice from joinder, a defendant must point to specific evidence that the joinder was prejudicial. *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005). "[A]n unproven assertion is not compelling evidence of actual prejudice." *Id.* at 679. "[A] jury is presumed capable of considering each criminal count separately, and any prejudice may be cured by limiting instructions." *United States v. Cope*, 312 F.3d 757, 781 (6th Cir. 2002) (internal citations omitted).

It was not fundamentally unfair to join the three criminal cases against Petitioner in a single trial. As discussed by the Michigan Court of Appeals, there were many significant similarities between the three cases that supported their consolidation for trial. In addition, as both the trial court and court of appeals noted, if the cases were tried separately, each victim's testimony

would have been admissible at the other victims' trials under Mich. R. Evid. 404(b) as evidence of a common plan or scheme. Petitioner was not prejudiced by having a single jury hear all the charges against him, as the full breadth of the charges would have been heard by each jury even if the cases had been tried separately. *See United States v. Jacobs*, 244 F.3d 503, 507 (6th Cir. 2001); *Krist v. Foltz*, 804 F.2d 944, 947–48 (6th Cir. 1986); *see also Taylor v. Lafler*, No. 09-10556, 2012 WL 933132, at *5 (E.D. Mich. Mar. 20, 2012) (joinder of three cases for a single trial where Petitioner was charged with multiple counts of criminal sexual conduct in each case did not deprive Petitioner of a fair trial). Petitioner was not entitled to separate trials simply because he may have had a better chance of acquittal in separate trials. *Zafiro v. United States*, 506 U.S. 534, 540 (1993). Furthermore, the potential for prejudice was mitigated by the trial court's instructions to the jury. The trial court instructed the jurors that Petitioner was charged with ten separate crimes: four against Tanitha Gayles, three against Crystal Davis and two against Antoinette Perry. The court instructed the jury on each of the offenses and charged the jurors to consider each crime separately in light of all the evidence. (Tr. IV, 106-118.) The court also stated that the jurors could find Petitioner not guilty or guilty of any one of the counts. (Tr. IV, 118.) Consequently, the joinder of Petitioner's cases for trial did not result in actual prejudice, nor deprive Petitioner of a fair trial.

### B. Admission of Bad Acts Evidence

In Ground II, Petitioner contends that the trial court erred by granting the prosecutor's pre-trial motion to admit the testimony of Crystal Young, Latina Anderson and Ebony Smith, as evidence of other crimes, wrongs or acts under Mich. R. Evid. 404(b). Petitioner maintains that the facts surrounding those alleged sexual assaults or attempted sexual assaults were so dissimilar to the cases being tried that any probative value was far outweighed by the danger of unfair prejudice.

Petitioner further argues that while the trial court later reversed its decision and precluded the testimony of Anderson and Smith, irreversible prejudice had occurred when the prosecutor described their cases to the jury during opening statements.

The Michigan Court of Appeals concluded that the evidence was properly admitted under Mich. R. Evid. 404(b), stating:

> Next, defendant argues that the trial court erred in admitting irrelevant and unduly prejudicial MRE 404(b) evidence. We disagree. We review a trial court's decision to admit other-acts evidence for an abuse of discretion, but preliminary decisions regarding admissibility that involve questions of law are reviewed de novo. *People v Dobek*, 274 Mich App 58, 84-85; 732 NW2d 546 (2007). To be admissible under MRE 404(b), other acts evidence generally must satisfy three requirements: (1) it must be offered for a proper purpose; (2) it must be relevant; and (3) its probative value must not be substantially outweighed by its potential for unfair prejudice. *People v Knox*, 469 Mich 502, 509; 674 NW2d 366 (2004). A proper purpose is one other than establishing the defendant's character to show his propensity to commit the offense. *People v VanderVliet*, 444 Mich 52, 74; 508 NW2d 114 (1993), mod 445 Mich 1205 (1994). Where the charged act and other acts are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system, evidence of the other acts is logically relevant to show that the charged act occurred; the other acts need not be part of a single continuing conception or plot. *Sabin*, *supra* at 63-64. Although general similarity alone does not establish a plan, scheme or system, where the common features among the various acts are so similar that it is natural to find they are caused by a general plan, the evidence is properly admitted. *Id*. at 64-65.
>
> The facts of the instant cases suggest that defendant had a plan, scheme or system for perpetrating sexual assaults. As noted above, in each case, defendant would approach his young female victim, who was walking alone in Detroit in the morning, ask them if they wanted to eat, and force them into his vehicle with a weapon. Although one victim was able to escape at that point, the other two victims reported nearly identical sexual assaults including the order of events and defendant's commands during the assault.
>
> CY, the MRE 404(b) witness, testified that while walking to the bus stop in Detroit one afternoon, defendant pulled up alongside her and asked for her phone number. CY provided it, and the two arranged to go out to breakfast a few days later, at defendant's request. When defendant picked up CY, he indicated that he needed to stop by his house first before going out to breakfast. Once at his house, he forced

CY out of the car and pushed her into his house. Defendant kept CY in his house against her will until eventually permitting her to leave. Defendant later caught up with CY down the street and forced her into his car, brought her inside his house once more and sexually assaulted her by taking off her shirt, pushing her onto a bed and holding her down, attempting to put his hand down her pants, licking her face, and trying to take off her pants. Defendant also slapped CY in the face as she cried. After letting her leave, he once again followed her down the street and attempted to force her into his car.

That there were dissimilarities between CY's incident and those involved in the consolidated cases does not preclude a finding of a common scheme or plan. All of the incidents have meaningfully similar features, including: (1) defendant approached the young women who were walking alone in Detroit, (2) defendant asked all four women to go out to breakfast, (3) defendant either forced or attempted to force all four women into his black Lexus, and (4) defendant sexually assaulted the three victims that he was able to force into his car. These features evidence a common scheme, involving the luring or forceful taking of young women into his car to perpetrate violent sexual abuse.

In addition to showing a common scheme or plan, the evidence was also relevant in rebutting defendant's consent defense. Defendant argued that all of the sex was consensual and that "these weren't abductions at all" but merely "business deals gone bad." Because defendant interjected consent as a defense, CY's testimony was admissible to show that none of the victims consented. "In a sexual assault prosecution, evidence of other acts is admissible under MRE 404(b) if it 'tend[s] to show a plan or scheme to orchestrate the events surrounding the rape of complainant so that she could not show nonconsent.'" *People v Gibson*, 219 Mich App 530, 533; 557 NW2d 141 (1996), quoting *People v Oliphant*, 399 Mich 472, 488; 250 NW2d 443 (1976). We find that the other acts evidence in this case shows such a scheme. Based on the similarities, the probative value of the MRE 404(b) evidence was not substantially outweighed by the possibility of unfair prejudice.

Moreover, to ensure that the jury did not improperly consider the MRE 404(b) evidence, the trial court gave a limiting instruction cautioning the jury not to use the other acts evidence as evidence of character or propensity, and jurors are presumed to follow their instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). The other acts evidence was offered for a proper purpose, was relevant, and the probative value of the testimony was not substantially outweighed by its potential for unfair prejudice. Accordingly, the evidence was properly admitted pursuant to MRE 404(b).

(MCOA Op. 3-4.)

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle*, 502 U.S. at 67-68, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. There is no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence. In *Estelle*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process. 502 U.S. at 75. The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime. *Id.* at 75 n.5. While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms. The Sixth Circuit has also recognized that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512.

Furthermore, Petitioner was not denied a fundamentally fair trial as a result of the trial court's admission of the 404(b) evidence. While there were some differences between the complainants' cases and the cases of the 404(b) witnesses, the Michigan Court of Appeals identified

key similarities between the complainant's cases and Crystal Young's case that demonstrated "a common scheme, involving the luring or forceful taking of young women into his car to perpetrate violent sexual abuse." (MCOA Op. 3.) Likewise, in the cases of the other two proposed 404(b) witnesses, Petitioner initially approached the witnesses in his car and ultimately drove them to a location, i.e., his home, where he sexually assaulted them. While not identical in all aspects, the other acts evidence was sufficiently similar to the charged acts to show the defendant's common plan, scheme, or motive. *See People v. Knox*, 674 N.W.2d 366, 370 (Mich. Ct. App. 2004). Also, as discussed by the Michigan Court of Appeals, the testimony of the three 404(b) witnesses was relevant to rebut Petitioner's defense of consent. Because the other acts evidence was probative of something other than the defendant's character or propensity to commit the charged offense, it was properly admitted at trial. *Id*. at 370-71.

Furthermore, the trial court gave the jury a thorough limiting instruction with regard to Crystal Young's testimony. (Tr. IV, 103-04.) The trial court explicitly instructed the jury that they only could consider whether the evidence "tends to show that the Defendant acted purposefully without the consent of complainants" or that "Defendant used a plan, system or characteristic scheme." (Tr. IV, 103.) The court further instructed that the jury could not consider Young's testimony as evidence that Defendant "is a bad person or that he had tendency to commit certain kinds of crimes." (*Id.*) The trial court also gave the jury a curative instruction regarding the 404(b) witnesses who were introduced by the prosecutor, but ultimately did not testify at trial. The court stated:

> You may remember, maybe you remember, that in Mr. Clark's [the prosecutor's] opening statement he mentioned that he was going to call the three official complainants in this case, the three young ladies whose cases you are going

to decide, but he also was going to call three more people who claimed to have similar incidents with the Defendant, Mr. Whitsett, and that those other three incidents were going to be offered as evidence to support the People's theory of the case.

Well, obviously, three additional witnesses were not called. Only one additional witness, Crystal Young, whose case you're not deciding, was called in and the reason for that is because I ruled that you didn't need to hear any more evidence.

I think that you've had enough evidence now to make an informed decision one way or the other on this case and I don't want to prolong the case beyond where I thought it needed to be and so it's not Mr. Clark's fault. It not Miss Reed's [defense counsel's] fault.

There -- simply the fact is that some of the evidence that Mr. Clark mentioned in his opening statement was not presented and that was because of my ruling. Now, please remember that opening statements are not evidence anyway. They're only meant to help you understand each side's theory and point of view and what they expect the evidence will show you should -- since there wasn't any additional evidence presented about those other two complainants you should disregard it and it shouldn't enter into your discussions at all.

You should make your decision based upon the evidence that was presented in the case.

(Tr. IV, 53-54.) The Supreme Court has stated that courts are "normally [to] presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *Greer v. Miller*, 483 U.S. at 767 n. 8 (1987); *see also Hill v. Mitchell*, 400 F.3d 308, 325 (6th Cir. 2005) ("[F]ederal courts generally presume that juries follow their instructions[.]" (internal quotation marks omitted)). Petitioner has not pointed to anything that would demonstrate there was an "overwhelming probability" that the jury was unable to follow the trial court's instructions concerning the 404(b) witnesses.

Petitioner cannot prove an unreasonable application of federal law on this issue necessary to warrant habeas relief.

### C.    Denial of Motion for Mistrial

Petitioner contends in Ground III that the trial court committed reversible error when it denied his motion for mistrial based upon the admission of improper 404(b) evidence. Defense counsel raised the motion after the trial court ruled that 404(b) witnesses Latina Anderson and Ebony Smith would not be permitted to testify at trial. Counsel argued that no instruction could cure the prejudice created by the prosecutor's introduction of Anderson and Smith's testimony in his opening statement.

The Michigan Court of Appeals addressed the denial of the motion for a mistrial solely as a matter of state law, concluding that the decision was not an abuse of discretion. (MCOA Op. 4.) The court of appeals further noted that the "court's instruction directing the jury to disregard all references to the two Mich. R. Evid. 404(b) witnesses mentioned in the prosecution's opening statement, but who did not ultimately testify, was sufficient to dispel any potential for prejudice." (*Id.*)

As previously discussed, the federal court has jurisdiction to review a state prisoner's habeas petition only on the ground that the challenged confinement violates the Constitution, laws or treaties of the United States. *See* 28 U.S.C. § 2254(a); *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *see also Estelle*, 502 U.S. at 67–68 ("it is not the province of a federal court to reexamine state-court determinations on state-law questions"). Therefore, Petitioner's claim is subject to review only to the extent that the prosecutor's discussion of the non-testifying 404(b) witnesses during his opening statement so infected the trial with unfairness as to render the resulting conviction a denial of due

process, which could not be remedied other than by declaring a mistrial. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 642–43 (1974); *see also Darden v. Wainwright*, 477 U.S. 168, 179–80, 182 (1986). I concluded above that the trial court's admission of the 404(b) evidence did not rise to the level of a due process violation. Consequently, the trial court's decision to give a curative instruction, rather than declare a mistrial, did not violate the Due Process Clause.

### D.    Sufficiency of the Evidence

In his fourth ground for habeas corpus relief, Petitioner claims that the prosecutor failed to present sufficient evidence to prove the offenses for which he was convicted beyond a reasonable doubt. Specifically, Petitioner appears to argue that the prosecutor failed to present sufficient evidence to rebut his defense of consent.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988). Because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference

should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA." *See Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008).

Applying the state-law standard of review for a sufficiency of the evidence claim, which is the same as the *Jackson* standard, Michigan Court of Appeals concluded that the prosecutor presented sufficient evidence to support Petitioner's convictions:

> Defendant also claims that there was insufficient evidence to support his nine convictions. We disagree. Defendant was convicted of five counts of first-degree CSC (three counts relating to TG, two counts relating to CD), one count of second-degree CSC (relating to CD), two counts of kidnapping (relating to TG and CD), and one count of attempted kidnapping (relating to AP). When reviewing a claim of insufficient evidence, we review the record de novo and take the evidence in the light most favorable to the prosecutor to determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Wilkens*, 267 Mich App 728, 738; 705 NW2d 728 (2005).

> Kidnapping occurs when a person knowingly restrains another person with the intent to "[e]ngage in criminal sexual penetration or criminal sexual conduct with that person." MCL 750.349(1)(c). Regarding attempted kidnapping, "an 'attempt' consists of (1) an attempt to commit an offense prohibited by law, and (2) any overt act towards the commission of the intended offense" which goes beyond mere preparation. *People v Thousand*, 465 Mich 149, 164; 631 NW2d 694 (2001).

> To prove the crime of first-degree CSC under the theories asserted by the prosecutor in this case, the prosecutor had to establish that: (1) the defendant committed sexual penetration with another person; and (2) (a) the penetration occurred under circumstances involving the commission of any other felony; (b) the defendant was armed with a weapon or any article used or fashioned in a manner to lead the victim to reasonably believe it to be a weapon; or (c) the defendant caused personal injury to the victim and force or coercion is used to accomplish sexual penetration. MCL 750.520b(1)(c), (e), and (f). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body." MCL 750.520a(p).

> A person is guilty of CSC in the second degree, MCL 750.520c(1)(a), if the person engages in sexual contact with another person and the contact occurs under

circumstances involving the commission of any other felony. MCL 750.520c(1)(c). "Sexual contact" includes the intentional touching of the victim's or actor's intimate parts or the intentional touching of the clothing covering the immediate area of the victim's or actor's intimate parts, if that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification, done for a sexual purpose, or in a sexual manner for revenge, to inflict humiliation, or out of anger. MCL 750.520a(o). The testimony of the victim alone can constitute sufficient evidence to establish a defendant's guilt. MCL 750.520h; *People v Taylor*, 185 Mich App 1, 8; 460 NW2d 582 (1990).

TG testified that defendant approached her when she was walking down the street and asked her out to breakfast. After she declined, he put a knife to her throat and forced her into his car. Defendant threatened that if she attempted to escape, he would shoot her in the back. Defendant drove to a remote location, put his hands down TG's pants and rubbed her vagina. He then directed her to take off her pants, perform oral sex upon him, and have sexual intercourse with him. TG testified that she complied out of fear for her life. The sperm sample from TG's rape kit matched defendant. Based on the foregoing, there was sufficient evidence from which a rational jury could find that defendant kidnapped TG and committed three counts of first-degree CSC upon her.

CD testified that, as she was walking down the street, defendant came up from behind her and pushed her to the ground. He held a screwdriver to her forehead and threatened that if she yelled, he would kill her. He forced her into his car and drove off. Eventually, defendant parked, covered his hands in baby oil, and rubbed CD's vagina. Defendant then forced her to perform oral sex upon him and have intercourse with him. CD's testimony was corroborated by an onlooker, who testified that she witnessed CD being knocked to the ground and dragged away by a man. Additionally, the rape kit performed on CD established that the sperm collected from CD matched defendant. Consequently, a rational jury could readily find that defendant committed kidnapping, two counts of first-degree CSC, and one count of second-degree CSC in relation to CD.

AP testified that as she was walking to her cousin's house in Detroit, defendant pulled up alongside her and asked her out to breakfast. AP declined, and defendant got out of his car and attacked her, punching her in the face several times. He then attempted to drag her into his car, but AP was able to escape. AP's treating physician confirmed that AP suffered injury to her eye consistent with having been punched. Based on this testimony and the similarity to the other victims, a rational jury could find that defendant intended to restrain AP in order to engage in criminal sexual conduct and, thus, attempted to kidnap AP. In sum, reviewing the evidence in the light most favorable to the prosecutor, there was ample evidence upon which

a rational trier of fact could find that the essential elements of each of the nine charged crimes were proven beyond a reasonable doubt. *Wilkens, supra*.

(MCOA Op. 4-6.)

As set forth in detail by the Michigan Court of Appeals, the prosecutor provided ample evidence to prove beyond a reasonable doubt the elements of the ten offenses for which Petitioner was convicted. Petitioner does not maintain that the prosecution failed to introduce credible evidence in support of the charges against him. Rather, Petitioner maintains that his evidence of consent should have prevailed. "In the context of the CSC statutes, consent can be utilized as a defense to negate the elements of force or coercion." *People v. Waltonen*, 728 N.W.2d 881, 887 (Mich. Ct. App. 2006). However, under Michigan law, consent is an affirmative defense, and lack of consent is not an element of the crime to be proven by the prosecution. *Id.* at 888 n.4. Petitioner's argument regarding whether the defense of consent should have prevailed implicates the assessment of credibility - a determination that is exclusively the province of the trier of fact. *United States v. Bond*, 22 F.3d 662, 667 (6th Cir. 1994). In general, attacks on witness credibility are "simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence." *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002) (quoting *United States v. Adamo*, 742 F.2d 927, 935 (6th Cir. 1984)). The fact that the jury credited the victim's version of the events over Petitioner's is not a matter subject to habeas corpus review. Consequently, the decision of the Michigan Court of Appeals was not an unreasonable application of *Jackson*, nor was it based upon an unreasonable determination of the facts in light of the evidence presented at trial.

**E.    Sentence**

In his final ground for relief, Petitioner contends that his seven concurrent sentences of 29-to-50 years violate his Eighth Amendment right against cruel and unusual punishment.  The Michigan Court of Appeals rejected Petitioner's claim, stating:

> Finally, defendant argues that his seven sentences of 29 to 50 years' imprisonment constitute cruel and unusual punishment. Because defendant raises this issue for the first time on appeal, his sentences are within the appropriate guidelines range, and he cannot demonstrate that the trial court engaged in incorrect scoring or relied on inaccurate information to determine his sentence, defendant is precluded from raising this issue on appeal. MCL 769.34(10); *People v Kimble*, 470 Mich 305, 310-311; 684 NW2d 669 (2004). In any event, sentences falling within the recommended guidelines range are presumptively proportionate, and proportionate sentences do not constitute cruel and unusual punishment. *People v Drohan*, 264 Mich App 77, 92; 689 NW2d 750 (2004).

(MCOA Op. 6.)[3]

The United States Constitution does not require strict proportionality between a crime and its punishment.  *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991); *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000). "Consequently, only an extreme disparity between crime and sentence offends the Eighth Amendment."  *Marks*, 209 F.3d at 583; *see also Lockyer v. Andrade*, 538 U.S. 63, 77 (2003) (gross disproportionality principle applies only in the extraordinary case); *Ewing v. California*, 538 U.S. 11, 36 (2003) (principle applies only in "'the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross

---

[3]To the extent Petitioner procedurally defaulted his claim by raising it for the first time on appeal, federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits.  *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law.")).  Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default.  *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

disproportionality'") (quoting *Rummel v. Estelle*, 445 U.S. 263, 285 (1980)).  A sentence that falls within the maximum penalty authorized by statute "generally does not constitute 'cruel and unusual punishment.'"  *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir. 2000) (quoting *United States v. Organek*, 65 F.3d 60, 62 (6th Cir. 1995)).  Ordinarily, "[f]ederal courts will not engage in a proportionality analysis except in cases where the penalty imposed is death or life in prison without possibility of parole."  *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995).  Petitioner was not sentenced to death or life in prison without the possibility of parole, and his sentence falls within the maximum penalty under state law.  Furthermore, Petitioner's sentence does not present the extraordinary case that runs afoul of the Eighth Amendment's ban of cruel and unusual punishment. Accordingly, the decision of the Michigan Court of Appeals was not an unreasonable application of clearly established Supreme Court precedent.

### Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied.


Dated:  March 15, 2013                    /s/  Joseph G. Scoville
                                          United States Magistrate Judge


### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).